1          SACRAMENTO, CALIFORNIA

2      THURSDAY, APRIL 17, 2014; 3:00 P.M.

3              ---oOo---

4

5          THE CLERK:  Calling civil case 14-636, Center For

6   Competitive Politics versus Kamala Harris.

7          It's on for plaintiff's motion for preliminary

8   injunction, Your Honor.

9          THE COURT:  Counsel, your appearances please.

10         MR. DICKERSON:  Allen Dickerson of Center for

11  Competitive Politics for the plaintiff, and I'm joined by

12  Alan Gura from Gura and Possessky.

13         THE COURT:  Thank you.  Good afternoon.

14         MS. GORDON:  Good afternoon.  Alexandra Gordon from

15  the Office of the Attorney General for defendant Attorney

16  General Harris, and with me is Tamar Pachter.

17         THE COURT:  Thank you.

18         MS. PACHTER:  I'm Tamar Pachter.  Good afternoon, Your

19  Honor.

20         THE COURT:  Two issues that have come about here, and

21  this is on for a motion for a preliminary injunction, and

22  from the plaintiff's standpoint, it's an issue with the

23  intent of 26 United States Code, Section 6104(c)(3) and what

24  was meant when that statute was enacted and whether or not

25  that statute would be or should be included in this request

1    by the plaintiffs.

2         Now, I did receive the letter dated April 14, 2014,

3    from the Department of Justice citing the Stokwitz versus

4    United States case from 1987.  That's 831 Fed.2d 893.

5         I'm assuming the plaintiffs have had an opportunity to

6    review that as well?

7         MR. DICKERSON:  We have, Your Honor.

8         THE COURT:  I've read the case and read the facts, and

9    looking at this case and the facts, from the plaintiff's

10   standpoint, would you be able to explain how you believe that

11   Section 6104(c)(3) is intended to extend beyond just the

12   Internal Revenue Service and extend on to other individuals

13   and entities, which in this case, would be the State of

14   California?

15        MR. DICKERSON:  I'd be happy to, Your Honor.

16        I think there's a few answers to that.  The first is

17   that Stokwitz is from 1987 and the language that we are

18   relying upon is from 2006.  So much as with the legislative

19   history that backed up the Stokwitz opinion and also

20   legislative history relied upon by the state, I think there's

21   some question as to its utility, given just the fact that

22   it's 20 years old before the thing we rely upon.

23        In terms of what congress meant, I think it's

24   important to distinguish a few things.  One is that the

25   Stokwitz case involved a question of procedure.  You have to

1    go to this particular place and you have to get in this

2    particular way or there are other procedures that's exist,

3    and I think there's two sub points on that.

4         One is that 6104(c)(3) is not merely a procedure.  Of

5    course we pled it was procedure and we do continue to believe

6    that's correct, but it's also a ban.  There's the fact that

7    if the Attorney General were to go to the Secretary of the

8    Treasury and ask for this precise information, there's a

9    specific -- she would not get it.  There's a specific portion

10   of the statute passed in 2006 that says the Secretary of the

11   Treasury has no discretion to provide to the Attorney General

12   this particular form.

13        So I think that congress' intention in enacting, not

14   only a procedure analogous to Section 6103, but also this ban

15   on the release of donor information by 501(c)(3)

16   organizations suggests that 501(c)(3) organizations are

17   different under the law.

18        THE COURT:  It seems like the legislative history for

19   this statute, it was directed exclusively toward the Internal

20   Revenue Service.  Because of the fact that the Internal

21   Revenue Service is one of the largest entities in the federal

22   government, it collects more detailed information about

23   entities and individuals in today's world -- well, maybe not,

24   but collects more information at the time than any other

25   governmental entity and that there was a need to have the

1    protections put in place with the Internal Revenue Service.

2         I have not seen anything or heard an argument that

3    said that limitation is specifically to be extended.  I

4    think -- there's one point.  In reading what Senator Weicker

5    said with respect to how this was enacted and what the points

6    were, there's nothing that -- even though it's 20 years old,

7    I think the reason why it was enacted in the first place is

8    still to protect information from being disseminated by the

9    secretary with the IRS.

10        MR. DICKERSON:  I take the point, Your Honor.

11        I would say in response that, first of all, as you

12   pointed out, the unique position of the IRS may not be so

13   unique any more, especially in the world where the Attorneys

14   General of States may simply have a dragnet request for this

15   information.

16        At bottom, this is really a situation where -- if we

17   look at Stokwitz, this is a case where the Department of the

18   Navy does a criminal investigation of office space controlled

19   by the Department of the Navy, and there's some question

20   about whether it should have been a Bivens action, possibly

21   an illegal search of that, and that's how they got the form.

22        THE COURT:  Right.  It was his secretary and assistant

23   and other people who had searched his office and briefcase

24   and took out a bunch of the documents, information including

25   tax returns.

1          MR. DICKERSON:  Precisely.  And the Stokwitz opinion

2     limits itself to this idea that, okay, in a case of civil

3     discovery or subpoenas or that sort of process, that 6103

4     does not necessarily extend beyond the Treasury Secretary,

5     but this isn't a case like Stokwitz of civil process or a

6     criminal investigation or anything similar.  There's no

7     articulated individualized anything in this case.

8          THE COURT:  But the bottom line is you don't have any

9     authority that says that this statute can be extended to

10    beyond the Internal Revenue Service.

11         MR. DICKERSON:  The only thing I have is the language

12    of the statute banning the Attorney General from receiving

13    this form, And the fact --

14         THE COURT:  The Attorney General or the Internal

15    Revenue Service or receiving it from the Internal Revenue

16    Service?

17         MR. DICKERSON:  The language in the statute says the

18    Treasury Secretary shall not give it to the Attorney General.

19    Our position is that this is a situation that the Attorney

20    General is trying to do something indirectly, which she very

21    explicitly cannot do directly.

22         THE COURT:  So she's going directly to the corporation

23    and saying:  Please provide us with the information, because

24    that's not the Internal Revenue Service, so, therefore, the

25    statute does not apply, does it?

1       MR. DICKERSON:  I certainly don't dispute we are not

2   the Internal Revenue Service.

3       THE COURT:  So if you're not the Internal Revenue

4   Service, how does this statute apply to you?

5       MR. DICKERSON:  Because the object and purpose of 6104

6   is different from 6103.  6103, which is the statute for

7   Stokwitz, is about individual tax returns.  Congress created

8   a separate section to deal with tax exempt organizations

9   because they're different, because the privacy interests

10  and -- we'll probably bleed into the First Amendment issue at

11  some point, but the privacy interests of advocacy

12  organizations are different than those of private

13  individuals.

14      In 1976 when the senator was saying things on the

15  record, this information would not have been available

16  either.  At that point, the only carve-out was for state tax

17  organizations.

18      The statute's moved quite a ways from 1976 and it's

19  moved in a direction which strongly suggests an intention by

20  congress to preempt state action here; otherwise, it's hard

21  to make sense of the rest of 6104, which goes through the

22  process by which a (c)(3) is approved for a (c)(3) status,

23  and the fact that only if the secretary thinks it's relevant

24  to a law enforcement purpose is that information going to be

25  shared.

1          THE COURT:  But isn't everything that's being

2     controlled there being directed toward the secretary and

3     still going to the IRS?  Everything that's in 6103 or 6104 is

4     directed to the IRS and the bottom line.  That was the

5     legislative history.

6          MR. DICKERSON:  Your Honor, I don't have the

7     legislative history in 2006 because there doesn't seem to be

8     any I can identify.

9          THE COURT:  The only ones that we have are the ones

10    when the statute was first enacted, so that's what we're

11    going to go back to, and had congress intended to change that

12    legislative history, wouldn't they have changed it in 2006?

13         MR. DICKERSON:  I don't think congress has a

14    responsibility to create new legislative history if it's

15    creating a new statue.  It's simply created a new statute,

16    and that is a in separate section with a separate carve-out,

17    and the only ban I'm aware of in the relevant sections.

18         THE COURT:  Thank you.

19         MR. DICKERSON:  Thank you, Your Honor.

20         THE COURT:  A question for you, counsel.

21    Notwithstanding the direct, what appears to be, issue that we

22    have that this is directed toward the Internal Revenue

23    Service, isn't the -- is there a possibility there that there

24    could be conflict preemption because, in effect, it's

25    substance over form?

1    Here we're saying that we don't want to give out this

2    kind of information for certain reasons.  By doing it this

3    way and the State of California going after the entity

4    individually, aren't we kind of circumventing the intent?

5    MS. GORDON:  No, Your Honor, because there's

6    absolutely no evidence that congress had any intent,

7    actually, as counsel has said, to ban State Attorney Generals

8    from getting this sort of information.

9    State Attorney Generals are the primary regulators of

10   charitable organizations.  I don't think congress would be so

11   irrational as to essentially ban them from getting

12   information that they need.  All 6103 and 6104 do, as you

13   have said, is set forth a procedure about what the IRS can

14   do, but I would say that counsel is reading Stokwitz too

15   narrowly and reading 6104 way too broadly.

16   We have to ask ourselves, in trying to figure out what

17   is the purpose of congress, a strong enough purpose, a clear

18   and manifest purpose that overcomes the presumption against

19   preemption:  What were they intending to do?  Who did they

20   intend to regulate?

21   And the answer is the IRS.

22   And what is being regulated?

23   Although, yes, 6104 is a different statute, it

24   incorporates the definition of tax return and return

25   information from 6103(b)(1) and (2).  That's really specific

1   that tax return information and tax returns are literally the

2   copy filed with the IRS.

3         So if the secretary hasn't touched it, the federal

4   government takes the position that that's not federal tax

5   information any more, and there's clearly no barrier to a

6   state official, in this case, the Attorney General, who keeps

7   this confidential in a registry.  There's no barrier to her

8   ability to obtain it.

9         THE COURT:  Any response?

10        MR. DICKERSON:  Yes, Your Honor.

11        I would start by saying I think there's a suggestion

12   in the state's argument that we're claiming that this

13   information is beyond any enforcement power of the state.

14   We're not claiming that.

15        What we're saying is that the specific information on

16   a specific form is exactly the information filed with the

17   Secretary of the Treasury.  Talking about form over

18   substance, saying:  If I take a photocopy of a form I gave to

19   the Treasury Secretary that is suddenly not tax return

20   information, I think, is a little metaphysical.

21        THE COURT:  It's unique, but they're both governmental

22   entities.  I understand that.  I understand that I believe

23   that you're making this motion for the preliminary injunction

24   based upon what I think you believe is a reasonable extension

25   of referring to the Internal Revenue Service, because that is

1    a governmental entity, it's the United States Government, and

2    here we have the State of California through the Department

3    of Justice, another governmental entity, that is asking for

4    the information.

5         Where I'm having the issue is that this request is not

6    being made to the Internal Revenue Service.  Had it gone to

7    the Internal Revenue Service, I think we would all say:  No

8    issue here.

9         This request did not go to the Internal Revenue

10   Service, and there's been absolutely nothing that I've seen

11   in reading the case law or the statute that extends this

12   prohibition to anyone or anything other than the Internal

13   Revenue Service.  That's what I'm trying to figure out is how

14   you get that extension?

15        MR. DICKERSON:  I think, honestly, it's a case of

16   first impression.  I mean, that case was found late in the

17   research process because there's very little on this.

18        What we do have in the preemption context, we have

19   cases coming out of immigration, coming out of labor or

20   whatever, where the federal government, you know, has taken

21   positions about how you can hire, how you can determine

22   in-state tuition and how to do various other things, and the

23   state isn't allowed to come up with clever ways around them.

24        I absolutely take the point, but I don't think

25   Stokwitz provides the binding authority the state thinks it

does absent an actual judicial process of some sort.  If we

were in an audit or criminal investigation or civil

discovery, I think we would be in a different situation, but

also in those situations we would have recourse to the

courts.  This sort of dragnet attempt to get information,

which the federal government says you can't have through the

usual channel, is it very troubling and certainly contrary to

what congress intended.

THE COURT:  Again, I just look to the case, and

quoting from the case regarding the senate report, quote,

(Reading:)

            The IRS probably has more information about more

            people than any other agency in the country.

            Consequently, almost every other agency that has

            a need for information logically seeks it from

            the IRS.  Congress sought to end

            highly-publicized attempts to use the Internal

            Revenue Service for political purposes involving

            delivery of tax returns to the White House by

            the IRS and to regulates the flow of tax data

            from the IRS to state governments.

So, again, it's all coming out of the IRS releasing

the information.  Nothing that I've seen at this point,

again, refers to a state governmental entity seeking the

information directly from the nonprofit, so based upon what I

1  have seen with respect to the preemption, I don't find that

2  there has been sufficient evidence presented to the court at

3  this time that would support a motion for preliminary

4  injunction on that basis.

5       I'm just giving you -- these are tentative rulings

6  from the bench so that you understand where the court is

7  headed.  I want to make it clear that there will be a written

8  order that will follow and that will be the order that will

9  supercede any other comments that are made here.

10      The next issue that has been raised is one of freedom

11 of association.  In order -- there are certain standards that

12 have to be met to show that this request for this information

13 would implicate the freedom of association standards, and

14 there's got to be showings that this information, if received

15 or divulged would cause, (Reading:)

16              Harassment, membership withdrawal,

17              discouragement of new members or other

18              consequences that may have some type of chilling

19              impact on the member's associated rights.

20      What standard from the plaintiff's standpoint should

21 the court look to utilize in determining whether or not

22 there's been some chilling effect placed upon the plaintiff

23 and its membership?

24      MR. DICKERSON:  I'm afraid I would want to take it a

25 little earlier in the analysis, with the court's indulgence.

1 We disagree that the prima facia showing in Brock applies

2 here.  I can explain why that is to the court.

3       THE COURT:  Go ahead.

4       MR. DICKERSON:  Brock comes out of an audit.  It's not

5 a dragnet.  If you read the case carefully, one of the things

6 it says is, one, we're not applying the standard First

7 Amendment analysis.  We're not applying either exacting or

8 strict scrutiny.  We're applying the Ninth Circuit's standard

9 on judicial scrutiny in agent enforcement proceedings.

10 That's at page 348, 349 of the opinion, Your Honor.

11       I mean, if you look at Brock and look at Doyle that

12 followed it, this is a situation where the Secretary of Labor

13 had a suspicion about an organization, audited that

14 organization, that audit created a record that showed reason

15 to believe that this organization was operating in an

16 unacceptable manner, and only then did the Secretary of Labor

17 request the donors of the organization.

18       I'm not sure Brock and Doyle are terribly helpful in

19 the sense that they come out of this very different situation

20 where the government has, in fact, made a showing to begin

21 with in an enforcement context.

22       If you look at Doyle, specifically, the second case,

23 it really only makes sense in the context of an enforcement

24 action.  One of the things Doyle says is that the evidence

25 that has been put in by the plaintiff in favor of the dangers

1    of harassment, threats or reprisals, you haven't proved

2    causation because you haven't separated out the bad press of

3    the original investigation or the original government action

4    from the additional harm of disclosing your donors.

5         So I think that case has to be read in the context of

6    an enforcement proceeding and not as a generalized statement

7    about associational liberties.  I think that makes sense when

8    you look at other cases, such as Talley or Acorn Investments,

9    both of which we cited to Your Honor, or Gibson, which the

10   state conceded in footnote seven did not involve a prior

11   showing of harassment, threats or reprisals.

12        In Talley, you have a fairly strongly-worded dissent

13   by three judges, Justices of the Supreme Court, saying:  You

14   shouldn't have ruled this way precisely because there's no

15   record of harassment, threats or reprisals.

16        So I think the idea that there is this prima facia

17   showing is not actually borne out by the case law, and, more

18   importantly, that makes sense when you think about it,

19   because exacting scrutiny or strict scrutiny, both require

20   least restricted measures on behalf of the state.  To force

21   litigants to come in and make a showing before the state has

22   to show restricted measures would be to turn the substantive

23   law of the First Amendment of exacting scrutiny on its head.

24        I can't imagine a situation where absent, again, the

25   situations where the government has shown a need to

1    investigate or some sort of law enforcement role, that it's

2    acceptable for the organization to have to prove that it's

3    already been harmed before it can come in and challenge a

4    patently unconstitutional state action.  That wouldn't -- I

5    don't think that's the law in the Ninth Circuit or the law

6    nationally.

7         Again, we're in a situation of a dragnet request by

8    the Attorney General, which at least in the experience of my

9    organization and on information of other organizations, has

10   never happened before, and not in the sort of context where

11   the Secretary of Labor has an unchallenged ability to audit,

12   has used that ability to audit, had uncovered information

13   that was troubling and then asked for the administerial

14   information.

15         THE COURT:  Response?

16         MS. GORDON:  Your Honor, just to sort of back up, this

17   is not a dragnet request.  This is a request that is, in

18   fact, justified by a legitimate law enforcement purpose.

19         It's justified by being the chief regulator of

20   charitable organizations in California, and pursuant to that,

21   the Attorney General has broad powers to request information

22   and documents from charities who want to solicit within the

23   state.

24         We have requested, as a courtesy, the exact same

25   Schedule B form that the plaintiff has filed with the IRS.

1    We keep that form confidential.  If there's been no showing

2    that anything has happened to its associational rights from

3    filing this Schedule B with the IRS, it's hard to imagine how

4    filing an identical copy of your Schedule B with California

5    somehow is dragnet or causes any harm to your associational

6    rights.

7             There's no evidence here that it does.  In fact, the

8    case law is not limited to the fact that it was an

9    enforcement action or that it was a labor case or any of the

10   other ways that plaintiff has tried to limit Brock and Doyle.

11   Brock says very clearly at page 350, (Reading:)

12                      If appellants can make the necessary prima facia

13                      showing, the evidentiary burden will then shift

14                      to the government.

15            Doyle at 971 says, (Reading:)

16                      Once the fund made such a showing, the burden

17                      would shift to the department.

18            So in all of the cases that have been cited, including

19   the ones by plaintiff such as NAACP versus Alabama, there's a

20   very clear showing of harm.  Harm is part of the analysis,

21   whether the court talks about a prima facia case or not.

22   Here, there is not a scrap of evidence of harm, nor is it in

23   any way obvious why there would be to the associational

24   rights of this organization.

25            As we've said in our brief, whatever standard the

1    court applies, whether it's a balancing test, such as the one

2    used in the election context in Buckley versus Valeo or

3    Protect Marriage Dot.Com, that would be plaintiff's burden,

4    the burden on their associational rights, which we have no

5    evidence of, versus the government's strong interest in being

6    able to do its job.

7          Even if we go forward and we apply any kind of

8    exacting scrutiny, there's a compelling interest.  This is

9    narrowly tailored, and the request is substantially related

10   to the AG's ability to do her job.

11         MR. DICKERSON:  If I may, Your Honor?

12         THE COURT:  Yes.

13         MR. DICKERSON:  There's, of course, two parts to the

14   constitutional analysis.  We admitted in our reply brief, I

15   think as we must, that the law enforcement authority of the

16   Attorney General is an important, indeed perhaps a compelling

17   interest.  That's not the end of analysis.

18         The question is tailoring, and I think part of the

19   difficulty for me representing this organization in this

20   lawsuit is that the state has asserted this very strong

21   interest, this high need for this information, but the

22   mechanism by which -- let's be clear on what's already in the

23   record.

24         We have provided every scrap of information, including

25   the amounts given, redacted, but with the amounts given by

each individual involving our organization, the compensation
of officers and directors, the way the different programmatic
expenses are done, every single scrap of information about
our books is available to the state, as it is indeed to
everyone, except the names and addresses of our donors, and
no mechanism has been suggested why the names and addresses
of donors is so helpful, let alone release restricted means.

So I would say this is not correct reading of the
civil rights cases or Talley or of a case like Acorn
Investments where First Amendment Associational rights have
ben vindicated under heightened scrutiny without such a
preliminary showing, and, more importantly, does tie back to
the fact there --

It's a toothless tiger to have exacting scrutiny or
higher in associational cases only if you can show that
you've been already injured.  It's the duty of the state to
demonstrate it's used a tailored approach, and all we have
are conclusory statements that this particular information is
needed without any mechanism.

THE COURT:  Anything else?

MS. GORDON:  Your Honor, if it would be helpful to the
court, I'm happy to explain how this information is useful to
the AG in doing her job, but two things:  One, again, I think
we're talking past each other, and I'll just repeat that, in
fact, some showing of harm has to exist before the government

1    has to explain it has a compelling interest and how this is

2    narrowly tailored.

3          And, two, the cases such as Acorn Investments and

4    Talley, Talley is an overbreadth free speech case.  Acorn

5    Investments is also actually -- it's analyzed as a

6    content-based restriction on expression.  The information is

7    extremely useful, and the alternative would be audit, given

8    the 10 years Statute of Limitations is extremely disruptive

9    to a charitable organization where we can get easily get rid

10   of a lot of complaints that come in by just looking at the

11   donor list.

12         THE COURT:  All right.

13         Counsel, thank you.  Those answer all the questions I

14   have at this time.

15         With respect to the freedom of association standard

16   issue that's been raised, I'll take that under submission and

17   review that, and my written decision will encompass that as

18   well as the congressional intent also of the statute.

19         Anything else?

20         MR. DICKERSON:  Not if Your Honor is comfortable on

21   the third question.

22         THE COURT:  I am.

23         MS. GORDON:  Thank you very much.

24         MR. DICKERSON:  Thank you.

25              (Proceedings concluded at 3:29 p.m.).

1                           ---oOo---

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6

7                           _____

8                           MICHELLE L. BABBITT, CSR 6357

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3                           ---oOo---

4       BEFORE THE HONORABLE CHIEF JUDGE MORRISON C. ENGLAND, JR.

5                           ---oOo---

6   CENTER FOR COMPETITIVE
    POLITICS,
7
            Plaintiff,
8                                       No. Cr. S-14-CV-0636
    vs.                                 MCE-DAD
9
    KAMALA HARRIS, in her Official
10  Capacity as Attorney General
    of the State of California,
11
            Defendant.
12  _____

13

14                          ---oOo---

15

16                   REPORTER'S TRANSCRIPT

17

18          ARGUMENT ON PRELIMINARY INJUNCTION

19

20                   APRIL 17, 2014

21                          ---oOo---

22

23

24

25  Reported by:    MICHELLE L. BABBITT, CSR #6357

```
 1                          APPEARANCES

 2

 3     For the Plaintiff:

 4
               KAMALA D. HARRIS
 5             Attorney General of California
               455 Golden Gate Avenue
 6             Suite 11000
               San Francisco, California  94102
 7             BY:  ALEXANDRA GORDON
                    Deputy Attorney General
 8
       For the Defendant:
 9
               CENTER FOR COMPETITIVE POLITICS
10             124 S. West Street
               Suite 201
11             Alexandria, Virginia 22314
               BY:  ALLEN DICKERSON
12                  Admitted pro hac vice

13

14

15

16

17

18

19

20

21

22

23

24

25
```