# EXHIBIT A

O
JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICANS FOR PROSPERITY FOUNDATION,<br><br>           Plaintiff,<br><br>   v.<br><br>KAMALA HARRIS, in her Official Capacity as Attorney General of California,<br><br>           Defendant. | CASE NO.  CV 14-9448-R<br><br>ORDER FOR JUDGMENT IN FAVOR OF PLAINITFF |

     For the reasons that follow, this Court grants Americans For Prosperity Foundation's ("AFP") motion for a permanent injunction to enjoin the Attorney General of California from demanding its Schedule B form.  After conducting a full bench trial, this Court finds the Attorney General's Schedule B disclosure requirement unconstitutional as-applied to AFP.

     Plaintiff AFP is a non-profit corporation organized under Internal Revenue Code section 501(c)(3) that funds its activities by raising charitable contributions from donors throughout the country, including in California.  California state law requires charitable organizations, such as AFP, to file a copy of its IRS Form 990, including its Schedule B, with the State Registry.  *See*

*e.g.*, Cal. Code Regs. tit. 11, § 301. An organization's Schedule B includes all the names and addresses of every individual nationwide who donated more than $5,000 to the charity during a given tax year. While a nonprofit's federal tax return, IRS Form 990, must be made available to the public, an organization's Schedule B does not. 26 U.S.C. § 6104(b), (d)(3)(A).

Since 2001, AFP has filed its Form 990 as part of its periodic reporting with the Attorney General, without including its Schedule B. For each year from 2001 through 2010, the Attorney General accepted AFP's registration renewal and listed AFP as an active charity in compliance with the law. In a letter dated March 7, 2013, the Attorney General declared AFP's 2011 filing incomplete because it did not include the organization's unredacted Schedule B. In December 2014, AFP brought the present action seeking an order preliminarily enjoining the Attorney General from demanding its Schedule B. Among other claims, AFP argued that the California law requiring disclosure of its Schedule B to the Attorney General was facially unconstitutional. AFP also argued that the disclosure requirement was unconstitutional as-applied to it.

On February 23, 2015, this Court granted AFP's motion for preliminary injunction, finding that the Plaintiff had raised serious questions going to the merits of its case and demonstrated that the balance of hardships sharply favored Plaintiff. That decision was appealed by the Attorney General and remanded by the Ninth Circuit. *Americans for Prosperity Found. v. Harris*, 809 F.3d 536 (9th Cir. 2015). In its remand, the Ninth Circuit held that this Court is bound by its previous decision in *Center for Competitive Politics v. Harris,* 784 F.3d 1307, 1317 (9th Cir. 2015)—that the Attorney General's nonpublic Schedule B disclosure regime was not facially unconstitutional. *Americans for Prosperity Found.*, 809 F.3d at 538. The Ninth Circuit did, however, instruct this Court to have a trial on the as-applied challenge. *Id*. at 543.

Although AFP argues that this Court is not bound by the Ninth Circuit's prior rulings on its facial challenge since the record before the Court is much denser now than it was then, the "strong medicine" of facial invalidation need not and generally should not be administered when the statute under attack is unconstitutional as-applied to the challenger before the court. *See U.S. v. Stevens*, 559 U.S. 460, 482–83 (2010) (Alito, J., dissenting). Accordingly, the Court focuses solely on AFP's as-applied challenge.

2

### I.

Courts review First Amendment challenges to disclosure requirements under an "exacting scrutiny" standard. *John Doe No. 1 v. Reed*, 561 U.S. 186, 187 (2010); *Citizens United v. FEC*, 558 U.S. 310, 366 (2010). Exacting scrutiny "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." This encompasses a balancing test. In order for a government action to survive exacting scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *John Doe No. 1*, 561 U.S. at 196.

### A. Strength of Governmental Interest

Defendant argues that the state law requiring that all charities file a complete copy of IRS Form 990 Schedule B places no actual burden on First Amendment rights and is substantially related to the Attorney General's compelling interest in enforcing the law and protecting the public. Before the Ninth Circuit, as well as this Court, the Attorney General has claimed that her use for Schedule B information is compelling since that information reveals not just how much revenue a charity receives, but also who is donating it and how it is being donated. Additionally, the Attorney General claims that such information allows her to determine whether an organization has violated the law, including laws against self-dealing, improper loans, interested persons, or illegal or unfair business practices. The Court finds two issues with this stated purpose. First, over the course of trial, the Attorney General was hard pressed to find a single witness who could corroborate the necessity of Schedule B forms in conjunction with their office's investigations. And second, even assuming arguendo that this information does genuinely assist in the Attorney General's investigations, its disclosure demand of Schedule B is more burdensome than necessary.

#### i. Sufficiently Important Governmental Interest

Although *Center for Competitive Politics* found that the Attorney General's "disclosure requirement bears a 'substantial relation' to a 'sufficiently important' government interest," this Court, unlike the Ninth Circuit, had the benefit of holding a bench trial in the matter and was left unconvinced that the Attorney General actually needs Schedule B forms to effectively conduct its

3

1 investigations. 784 F.3d at 1317 (quoting *Citizens United*, 558 U.S. at 366). As a threshold
2 matter, the record is undisputed that AFP has been registered with the Attorney General since
3 2001 and has never included a Schedule B with its annual filings. For each year from 2001
4 through 2010, the Attorney General accepted AFP's annual registration and listed the foundation
5 as an active charity in compliance with the law. It was not until 2013 that the Attorney General
6 first notified AFP that its 2011 filing was incomplete because of the lack of Schedule B. The only
7 logical explanation for why AFP's 'lack of compliance' went unnoticed for over a decade is that
8 the Attorney General does not use the Schedule B in its day-to-day business. In fact, such an
9 admission was made by David Eller, the Registrar for the Registry of Charitable Trusts in the
10 Department of Justice. (Eller Test. 3/3/16 Vol. II, p. 75:16–20). As for the investigative unit of
11 the Charitable Trusts Section, trial testimony confirmed that auditors and attorneys seldom use
12 Schedule B when auditing or investigating charities. Steven Bauman, a supervising investigative
13 auditor for the Attorney General, testified that out of the approximately 540 investigations
14 conducted over the past ten years in the Charitable Trusts Section, only five instances involved the
15 use of a Schedule B. (Bauman Test. 3/4/16, p. 22:4–23:25). In fact, as to those five investigations
16 identified, the Attorney General's investigators could not recall whether they had unredacted
17 Schedule Bs on file before initiating the investigation. And even in instances where a Schedule B
18 was relied on, the relevant information it contained could have been obtained from other sources.
19 (Bauman Test. 3/4/16, p. 31:8–32:10).

### ii. Narrowly Tailored

The Attorney General argues that exacting scrutiny does not require the least restrictive
means. This contention is supported by the Ninth Circuit's previous review in this case.
*Americans for Prosperity Found.*, 809 F.3d at 541. However, the court only references *Chula
Vista Citizens for Jobs & Fair Competition v. Norris* for such a position. 782 F.3d 520, 541 (9th
Cir. 2015). In *Chula Vista*, association members alleged that the city's elector and petition-
proponent disclosure requirements for ballot initiatives violated their First Amendment rights to
freedom of speech and association. The Ninth Circuit upheld these disclosure requirements after
weighing the government's interests in the integrity of the electoral process and the public's

informational interest against the relatively small burden imposed on the association members' First Amendment rights. *Id.* at 538.

In the context of elections and campaign finance disclosure laws, which have been the majority of cases in recent years applying exacting scrutiny, unique considerations apply that specifically shape and define the application of exacting scrutiny. *See Ctr. for Competitive Politics*, 784 F.3d at 1312 n.2 ("most of the cases in which we and the Supreme Court have applied exacting scrutiny arise in the electoral context"); *e.g.*, *Citizens United*, 558 U.S. 310; *John Doe No. 1*, 561 U.S. 186; *Davis v. FEC*, 554 U.S. 724 (2008); *Buckley v. Valeo*, 424 U.S. 1 (1976); *Family PAC v. McKenna*, 685 F.3d 800 (9th Cir. 2012); *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990 (9th Cir. 2010). There are such substantial governmental interests in "provid[ing] the electorate with information" about the sources of election-related spending, in "deter[ring] actual corruption," in "avoid[ing] the appearance of corruption," and in "gathering the data necessary to detect violations of . . . contribution limits," that the Supreme Court has held that campaign-finance disclosure requirements are *per se* "the least restrictive means" of achieving the government's interests. *Buckley*, 424 U.S. at 66–68. Because disclosure requirements are inherently the least restrictive means of achieving the state's aims in the electoral context, the Ninth Circuit has held that in cases challenging mandatory disclosures in the electoral context "exacting scrutiny is not a least-restrictive-means test." *Chula Vista*, 782 F.3d at 541. That holding is properly limited to the electoral context. In the context of associational rights, however, "even though the governmental purpose [may] be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Louisiana v. NAACP*, 366 U.S. 293, 296 (1961).

Here, like in *NAACP*, even assuming the Attorney General presented a sufficiently important governmental interest, its interests can be more narrowly achieved as evidenced by the testimony of the Attorney General's own attorneys. During trial, the Attorney General's investigators testified that they have successfully completed their investigations without using Schedule Bs, even in instances where they knew Schedule Bs were missing. For example, Mr. Bauman testified that he has reviewed Form 990s in connection with audits that did not include

5

1  Schedule Bs. (Bauman Test. 3/4/16, p. 27:12–14). Specifically, he admitted that he successfully
2  audited those charities and found wrongdoing without the use of Schedule Bs. (*Id*. at 27:18–23).
3  In fact, Mr. Bauman admitted that he successfully audited charities for years before the Schedule
4  B even existed. (Bauman Dep., TX-731, p. 49:2–15). It is clear that the Attorney General's
5  purported Schedule B submission requirement demonstrably played no role in advancing the
6  Attorney General's law enforcement goals for the past ten years. The record before the Court
7  lacks even a single, concrete instance in which pre-investigation collection of a Schedule B did
8  anything to advance the Attorney General's investigative, regulatory or enforcement efforts. If
9  heightened scrutiny means anything, it at least requires the Government to convincingly show that
10 its demands are substantially related to a compelling interest, including by being narrowly tailored
11 to achieve that interest. While this Court cannot find such a disclosure requirement facially
12 invalid, it is prepared to find it unconstitutional as-applied to AFP, especially in light of the
13 requirement's burdens on AFP's First Amendment rights.

### B.  Actual Burden on First Amendment Rights

15     Setting aside the Attorney General's failure to establish a substantial relationship between
16 her demand for AFP's Schedule B and a compelling governmental interest, AFP would
17 independently prevail on its as-applied challenge because it has proven that disclosing its Schedule
18 B to the Attorney General would create a burden on its First Amendment rights. While the Ninth
19 Circuit in *Center for Competitive Politics* foreclosed any facial challenge to the Schedule B
20 requirement, it specifically left open the possibility that a party could show "'a reasonable
21 probability that the compelled disclosure of [its] contributors' names will subject them to threats,
22 harassment, or reprisal from either Government officials or private parties' that would warrant
23 relief on an as-applied challenge." 784 F.3d at 1317 (quoting *McConnell v. FEC*, 540 U.S. 93,
24 199 (2003)). As the Supreme Court has held, unfounded speculation, conclusory statements, fear,
25 and uncertainty untethered to the requirement at issue are insufficient. *Buckley*, 424 U.S. at 64,
26 69, 71–72. However, "[a] strict requirement that chill and harassment be directly attributable to
27 the specific disclosure from which the exemption is sought would make the task even more
28 difficult." *Id*. at 74. Examples of the type of evidence sufficient to succeed on an as-applied

6

1 challenge include past or present harassment of members due to their associational ties, or of
2 harassment directed against the organization itself, or a pattern of threats or specific manifestations
3 of public hostility. *Id.* This Court is more than satisfied that such a showing was made at trial.

4 During the course of trial, the Court heard ample evidence establishing that AFP, its
5 employees, supporters and donors face public threats, harassment, intimidation, and retaliation
6 once their support for and affiliation with the organization becomes publicly known. For example,
7 Lucas Hilgemann, Chief Executive Officer of AFP, testified that in 2013, the security staff of AFP
8 alerted him that a technology contractor working inside AFP headquarters posted online that he
9 was "inside the belly of the beast" and that he could easily walk into Mr. Hilgemann's office and
10 slit his throat. (Hilgemann Test. 2/23/16 Vol. I, p. 57:2–14). That individual was also found in
11 AFP's parking garage, taking pictures of employees' license places. (*Id.* at 57:15–23). Another
12 witness and major donor, Art Pope, testified about an AFP event in Washington D.C. in 2011. Mr.
13 Pope testified that after protestors attempted to enter the building and disrupt the event, they began
14 to push and shove AFP guests to keep them inside of the building. (Pope Test. 2/24/16 Vol. II, p.
15 47:7–15). Mr. Pope attempted to help a woman in a wheelchair exit the building; however the
16 protestors had blocked their path. (Pope Test. 2/25/16 Vol. I, p. 21:20–22:12). Once they finally
17 exited the building, they still had to go through a hostile crowd that was shouting, yelling and
18 pushing. (Id. at 22:22–23:2). At another event in Wisconsin, after speaking to a crowd of AFP
19 supporters, Mr. Hilgemann was threatened by a protestor who used multiple slurs and spit in Mr.
20 Hilgemann's face. (Hilgemann Test. 2/23/16 Vol. I, p. 48:12–49:15). Again, at another event in
21 Michigan where an AFP tent was set up, several hundred protestors surrounded the tent and used
22 knives and box-cutters to cut at the ropes of tent, eventually causing the large tent to collapse with
23 AFP supporters still inside. (*Id.* at 50:16–51:25).

24 The Court also heard from Mark Holden, General Counsel for Koch Industries, who
25 testified that Charles and David Koch, two of AFP's most high-profile associates, have faced
26 threats, attacks, and harassment, including death threats. (Holden Test. 2/23/16 Vol. II, p. 30:17–
27 35:13). Not only have these threats been made to the Koch brothers because of their ties with
28 AFP, but death threats have also been made against their families, including their grandchildren.

7

1  (*Id*. at 31:3–10).  Mr. Pope has faced similar death threats due to his affiliation with AFP and has
2  even encountered boycotts of his nationwide stores, Variety Wholesalers.  (Pope Test. 2/24/16
3  Vol. II, p. 22:8–15, 29:5–17).  In December 2013, about 130 protestors picketed in front of his
4  stores, in part, because of his affiliation with AFP.  (*Id*. 32:24–33:2).  As a result of these boycotts,
5  threats, and exposure, Mr. Pope testified that he considered stopping funding or providing support
6  to AFP.  (*Id*. at 50:1–3).
7       The Court can keep listing all the examples of threats and harassment presented at trial;
8  however, in light of these threats, protests, boycotts, reprisals, and harassment directed at those
9  individuals publically associated with AFP, the Court finds that AFP supporters have been
10  subjected to abuses that warrant relief on an as-applied challenge.  And although the Attorney
11  General correctly points out that such abuses are not as violent or pervasive as those encountered
12  in *NAACP v. Alabama* or other cases from that era, this Court is not prepared to wait until an AFP
13  opponent carries out one of the numerous death threats made against its members.

14  **II.**

15       A final argument to consider by the Attorney General is that its office is only seeking
16  disclosure of AFP's Schedule B for *nonpublic* use and therefore there is no potential for public
17  targeting of private donors; however, the Attorney General's inability to keep confidential
18  Schedule Bs private is of serious concern.  In its previous order remanding this case, the Ninth
19  Circuit found that "plaintiffs [] have raised serious questions as to whether the Attorney General's
20  current policy actually prevents public disclosure."  *Americans for Prosperity Found.*, 809 F.3d at
21  542.  As made abundantly clear during trial, the Attorney General has systematically failed to
22  maintain the confidentiality of Schedule B forms.
23       Pursuant to the Attorney General's purported confidentiality policy, Schedule Bs should
24  never be accessible through its Registry's public website.  The Attorney General's Registry
25  receives more than 60,000 renewal filings each year, 90% of which are paper filings.  Once the
26  Registry receives these filings, it is supposed to scan and then electronically store the documents,
27  separately tagging confidential documents such as Schedule Bs.  Kevis Foley, former Registrar,
28  testified at her deposition that separating out Schedule Bs and other confidential materials from

1    public filings is "very tedious, very boring work" and that "there is room for errors to be made."

2    (Foley Dep. TX-734, p. 174:8–21).  While human error can sometimes be unavoidable, the

3    amount of careless mistakes made by the Attorney General's Registry is shocking.

4        During the course of this litigation, AFP conducted a search of the Attorney General's

5    public website and discovered over 1,400 publically available Schedule Bs.  (TX-56).  Within 24

6    hours, all of those confidential documents were removed from the Registry's website.  (TX-736, p.

7    107:12–15).  Just one example of the Attorney General's inadvertent disclosures was the Schedule

8    B for Planned Parenthood Affiliates of California. The Attorney General was made aware that the

9    Registry had publically posted Planned Parenthood's confidential Schedule B, which included all

10   the names and addresses of hundreds of donors.  (TX-131).  An investigator for the Attorney

11   General admitted that "posting that kind of information publically could be very damaging to

12   Planned Parenthood…"  (Johns Test. 2/25/16 Vol. II, p. 41:18–21).  All told, AFP identified 1,778

13   confidential Schedule Bs that the Attorney General had publically posted on the Registry's

14   website, including 38 which were discovered the day before this trial.  (McClave Test. 2/24/16

15   Vol. I, p. 27:6–32:17).  The pervasive, recurring pattern of uncontained Schedule B disclosures—a

16   pattern that has persisted even during this trial—is irreconcilable with the Attorney General's

17   assurances and contentions as to the confidentiality of Schedule Bs collected by the Registry.

18       The Attorney General has continuously maintained that the Registry is underfunded,

19   understaffed, and underequipped when it comes to the policy surrounding Schedule Bs.  The

20   current Registrar effectively acknowledges that the Registry's approach to maintaining the

21   supposed confidentiality of Schedule Bs have been indefensible.  Not only did he admit that

22   information has been improperly classified, which would make it available to the public, but he

23   also conceded that the Registry has more work to do before it can get a handle on maintaining

24   confidentiality.  (Eller Test. 3/3/16 Vol. II, p. 95:7–11).

25       While the Attorney General will have this Court believe that proper procedures are now in

26   place to prevent negligent disclosures of Schedule Bs, the Court is unconvinced.  Once a

27   confidential Schedule B has been publically disseminated via the internet, there is no way to

28   meaningfully restore confidentiality.  Given the extensive disclosures of Schedule Bs, even after

explicit promises to keep them confidential, the Attorney General's current approach to confidentiality obviously and profoundly risks disclosure of any Schedule B the Registry may obtain from AFP. Accordingly, the Court finds against the Attorney General on the alternative grounds that her current confidentiality policy cannot effectively avoid inadvertent disclosure.

### III.

Because AFP has prevailed on its First Amendment as-applied challenge, it is entitled to declaratory and injunctive relief. Equitable relief has long been recognized as appropriate to prevent government officials from acting unconstitutionally. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)). Injunctive relief is particularly appropriate to prevent state officials from violating the First Amendment by compelling the disclosure of the names of an organization's supporters. *See Brown v. Socialist Workers '74 Campaign Comm. (Ohio),* 459 U.S. 87, 101–02 (1982); *Louisiana v. NAACP*, 366 U.S. at 297.

A "plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Specifically, the plaintiff "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id*. Each of these factors weighs in favor of an injunction here.

AFP has suffered irreparable harm. The Attorney General's requirement that AFP submit its Schedule B chills the exercise of its donor's First Amendment freedoms to speak anonymously and to engage in expressive association. Among other things, plaintiffs have demonstrated that the Schedule B disclosure requirement places donors in fear of exercising their First Amendment right to support AFP's expressive activity; the effect then is to diminish the amount of expressive and associational activity by AFP. Moreover, if AFP refuses to comply with the Attorney General's Schedule B submission requirement, the Attorney General has threatened to cancel its charitable registration, which would preclude it from exercising its First Amendment right to

1  solicit funds in California.  Any "loss of First Amendment freedoms . . . unquestionably
2  constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion);
3  *accord, e.g.*, *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014); *Valle Del Sol Inc. v. Whiting*, 709
4  F.3d 808, 828 (9th Cir. 2013); *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741,
5  748 (9th Cir. 2012); *Farris v. Seabrook*, 677 F.3d 858, 868 (9th Cir. 2012); *Thalheimer v. City of*
6  *San Diego*, 645 F.3d 1109, 1128 (9th Cir. 2011).  In particular, the government causes "irreparable
7  injury" when, as here, it places individuals "in fear of exercising their constitutionally protected
8  rights of free expression, assembly, and association."  *Allee v. Medrano*, 416 U.S. 802, 814–15
9  (1974).
10         Additionally, AFP's irreparable First Amendment injuries cannot adequately be
11  compensated by damages or any other remedy available at law.  Unlike a monetary injury,
12  violations of the First Amendment "cannot be adequately remedied through damages."  *Stormans,*
13  *Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).
14         The balance of hardships also favors granting an injunction.  Once AFP's donor
15  information is disclosed, it cannot be clawed back.  Thus, if the Attorney General is allowed to
16  compel AFP to disclose its Schedule B, the ensuing intimidation and harassment of AFP's donors,
17  and resulting chilling effect on First Amendment rights, cannot be undone.  *See Hollingsworth v.*
18  *Perry*, 558 U.S. 183, 196 (2010).  By contrast, the Attorney General has offered no evidence that
19  she will suffer injury if AFP does not produce its Schedule B.  The Attorney General does not
20  review Schedule Bs upon collection and virtually never uses them to investigate wrongdoing.
21  Indeed, the Attorney General has gone without AFP's Schedule Bs for over a decade, yet she has
22  demonstrated no harm from not possessing it.  Balancing the disclosure requirement's burden on
23  First Amendment interests against any negligible burden that an injunction might impose, it is
24  clear that the balance of hardships supports enjoining the Attorney General.
25         Finally, the public interest favors an injunction.  As the Ninth Circuit has "consistently
26  recognized," there is a "significant public interest in upholding First Amendment principles."  *Doe*
27  *v. Harris*, 772 F.3d at 683 (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974
28  (9th Cir. 2002)); *accord, e.g.*, *Thalheimer*, 645 F.3d at 1129; *Klein*, 584 F.3d at 1208.  In sum, the

11

1  four-factor test establishes that injunctive relief is appropriate to bar the Attorney General from
2  demanding Schedule Bs from AFP as part of their annual registration renewal.  *Brown*, 492 U.S. at
3  101–02; *Louisiana v. NAACP*, 366 U.S. at 297.
4       **IT IS HEREBY ORDERED** that the Attorney General is Permanently Enjoined from
5  Requiring AFP to File with the Registry a Periodic Written Report Containing a Copy of its
6  Schedule B to IRS Form 990.  AFP Shall No Longer Be Considered Deficient or Delinquent in its
7  Reporting Requirement because it Does Not File its Confidential Schedule B with the Attorney
8  General.  Each Party Shall Bear its Own Costs.
9  Dated: April 21, 2016.

                                    HON. MANUEL L. REAL
                                UNITED STATES DISTRICT JUDGE